UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

RICARDO BROWN,

                    Plaintiff,          04 Civ. 10062 (RWS)

        -against-                       OPINION

THE PENSION BOARDS, UNITED CHURCH
OF CHRIST,

                    Defendant.

------------------------------------X



A P P E A R A N C E S:

        Attorney for Plaintiff

        ROBERT G. LEINO, ESQ.
        354 E. 91st Street, Apt. 1101
        New York, NY 10128

        Attorneys for Defendant

        GORDON & REES, LLP
        One Liberty Plaza, 23rd Floor
        New York, NY 10006
        By:  Deborah Swindells Donovan, Esq.
             Diane Krebs, Esq.

**Sweet, D.J.**

        The  defendant,  the  Pension  Boards,  United  Church  of
Christ (the "Boards" or the "Defendant") has moved under Rule 56,
F. R. Civ. P., to dismiss the complaint of the plaintiff, their

1

former Controller, Ricardo Brown ("Brown" or the "Plaintiff") which alleged discrimination based on race and national origin, a hostile work environment, discrimination based on disability under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 292 (2007), and New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code § 8-107, and retaliation and interference under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.  Brown has cross-moved under Rule 56 for partial summary judgment on his claims for interference and retaliation with respect to his FMLA rights, for failure of the Boards to accommodate his disability, and for discriminatory discharge. Brown has withdrawn his claims of discrimination, retaliation and hostile work environment based on race, color or national origin. For the reasons set forth below, the motion of the Boards is granted, and the cross motion of Brown is denied.

## **Prior Proceedings**

The complaint of Brown was filed on December 20, 2004. An amended complaint was filed on August 8, 2005.  Discovery ensued.

The instant motions were heard on November 1, 2006.

1

## The Facts

The material facts are set forth in the parties' Statements of Material Facts pursuant to Local Rule 56.1 and their respective Responses and are not in material dispute except as noted.

The Boards is a not-for-profit organization that administers all benefits for the United Church of Christ for both clergy and lay people.

Bridget Langevine ("Langevine") is the Director of Human Resources and Administration for the Boards, and has held that position (albeit with different titles) since September 1999. She is responsible for ensuring that the Boards complies with labor and employment laws and for the day-to-day administration of the office. She is also responsible in part for decisions with regard to family and medical leave. Langevine received training in the Family and Medical Leave Act, Americans with Disabilities Act, state and local discrimination law, and wages at a comprehensive two-day seminar she attended in 2002, which also provided her with materials regarding those subjects.

During Brown's employment, the Boards maintained many

2

different employment-related policies, which were printed in the employee manual. These included policies pertaining to: equal employment opportunity ("EEO") and anti-harassment; punctuality/attendance; sick leave; FMLA; leaves of absence; grievance procedures; and disciplinary procedures. The Boards also provided a Health Insurance Portability and Accountability Act ("HIPPA") handbook as an appendix to the employee manual to advise employees of the issues regarding confidentiality and disclosure of health and medical information. The Boards claims to maintain a "zero tolerance policy" for discrimination and harassment.

With regard to sick leave, the employee manual specifically requires employees to call their supervisor prior to the beginning of each workday if they will be absent due to illness. Moreover, the manual specifically states: "An employee who fails to report to work for two consecutive days and fails to notify his or her supervisor of absence due to illness, shall be considered to have abandoned his/her position and will be discharged, unless there are extenuating circumstances satisfactory to The Pension Boards."

Brown began his employment with the Boards in July, 2002. He was the Boards' Controller, the second-highest position in the accounting department. His key job responsibilities included

3

budget analysis and preparation, preparation of financial statements, supervision of all accounting personnel, and coordination of all audits.

Brown was hired by Michael A. Downs ("Downs"), then Executive Vice President of Boards, at a salary of $105,000 per annum. He was also given a one-time sign on bonus of $12,500, the first such bonus ever given by Boards. Brown had not only the general accounting experience Boards sought but had also had previously worked with Boards' financial systems in connection with his former employment with Boards' outside auditor.

Brown received a copy of the employee manual when he first began his employment with Boards; he signed a "Statement of Awareness" at several points during his employment, acknowledging his receipt of the document and his obligation to comply with its terms. He also received a stand-alone version of Boards' EEO and anti-harassment policy on three separate occasions and received anti-harassment training. Additionally, he acknowledged that he read the HIPPA handbook and signed a memorandum of acknowledgment issued by Langevine, which emphasized the importance of treating HIPPA information in a protected manner.

Although Brown received the employee handbook, he has

4

stated that he never reviewed it.  He also did not read the HIPPA handbook, although he attended a training session lasting approximately one hour regarding the Boards' HIPPA policy.  Despite not reading the handbook, Brown has stated that he also understood that, if he was going to be absent from work, he was required to contact the office.

During Brown's tenure at Boards, he granted such leave to at least one of his subordinates, Ms. Ljubinka Janosevic.  Brown worked together with Langevine on FMLA issues.

At the outset of his employment, Brown reported to Donald G. Hart ("Hart"), then Treasurer, and Downs.

In or about October 2002, Julia Oliver ("Oliver") was hired by the Boards as the Chief Financial Officer and Treasurer (replacing Hart); she was officially given those titles as of January 1, 2003 after going through the normal voting approval cycle.  After Oliver was hired, Brown reported to her.  During the course of his employment with Boards, Oliver repeatedly gave Brown favorable performance evaluations.

Brown was one of the highest paid employees at Boards. Of the approximately 80 employees at Boards, only four had higher

5

salaries than Brown: Downs, who by this time had become the President; Donald Barnes, the Vice President; Oliver; and Kate Waterworth, the Chief Investment Officer.

According to Brown, in or around January 2004, he was feeling extremely "stressed out" due to work and was not sleeping well, which was taking a toll on his health. Brown was put under stress by his supervisory responsibility over the increased activities engendered by upcoming final audit to close Boards' books.

On Tuesday, January 27, 2004, Brown called Oliver's assistant to inform her that he would not be coming into work that day and in fact did not come. He did the same on the following day. There is some dispute as to whether Brown called in on January 29 and January 30 as well. Prior to Brown's call on January 28, Oliver's assistants were told that if Brown called in, he should be instructed to call Human Resources (i.e., Langevine) directly, including at her home. To Langevine's knowledge, at least one of these individuals gave Brown the message, but he did not call Langevine.

On Thursday, January 29, 2004, Boards received, via facsimile, a handwritten note from Dr. James Braun ("Dr. Braun") of

6

Village Physicians, PLLC regarding Brown. The note stated that Brown was under Dr. Braun's care "for an exacerbation of chronic illness and has been unable to work since this past Monday. He will be able to return to work Monday, February 9, 2004." The note did not specify the nature of the illness.

According to Dr. Braun, the chronic illness to which the note referred was Human Immunodeficiency Virus ("HIV"), and the exacerbation was part of the typical progression of the disease. Brown began treatment for HIV infection in 1998. In late January 2004, Brown's HIV condition had worsened to a point that Dr. Braun believed Brown had to begin taking medication which Brown had theretofore avoided.[1]

When Dr. Braun saw Brown in his office on January 29, 2004, he detected signs of anxiety, depression, insomnia, and fearfulness of medication. Brown had never exhibited signs of depression previously. While Dr. Braun had seen signs of anxiety in Brown since 1998, he had never seen them to this extreme. The source of this anxiety, based on Dr. Braun's observations, was

---

[1] HIV-positive patients with CD4 (Cluster of differentiation 4) glycoprotein levels below 200 cells per milliliter are classified as having Acquired Immunodeficiency Syndrome ("AIDS"). According to Dr. Braun, Brown's CD4 levels were in the low 200s in late January 2004.

7

Brown's fear of his disease process.[2]

Dr. Braun did not prescribe any medicine for the psychiatric symptoms he observed, because he wanted Plaintiff to see a psychiatrist or psychotherapist. Dr. Braun believed Brown unable to work because he was finally coming to terms with the extent of his illness and his need for treatment. According to Dr. Braun, his medical problems included anxiety, fear, depression and insomnia.

Brown's absence came at a time when Boards was about to be audited, and financial statements needed to be completed. From January to mid-February of each year, on-site audit activity occurs at Boards for an audit conducted by outside auditors. When Brown left, Boards was in the process of preparing a final audit financial statement for its Board. According to Brown, most of his auditing tasks had been completed as of January 29, 2004.

Boards has maintained that Brown's presence was needed while the audit proceeded, which began immediately after the preparation of the final audit statement. When Brown worked at Deloitte & Touche as the outside senior auditor, the Boards'

---

[2] According to Brown, among the effects of HIV infection is psychiatric disturbance.

8

Controller was his primary contact during Boards audits.  Once he became Controller at Boards, Brown was the lead figure in connection with outside audits.  Nonetheless, the early 2004 audit was completed in his absence.

During Brown's time out of work pursuant to his doctor's note, Langevine made several attempts to contact him, all of which were unsuccessful.  She also tried on numerous occasions to reach Brown's mother.  Langevine stated that the purpose of making contact was to confirm Brown's intent to return on February 9, 2004 and find out where to send the short-term disability and FMLA paperwork should Brown need to pursue those options.

It is Langevine's regular practice to attempt to make such contact with anyone out of work pursuant to a doctor's note, in order to ensure the absent employee understands her rights and obligations and to verify that the necessary paperwork is sent to the appropriate location.  Langevine did not send such paperwork to Brown because she was not able to reach him to verify his location.  There had not previously been a situation in which Langevine was unable to make contact with an absent employee.

Brown flew to Costa Rica on the morning of Saturday, January 31, 2004.  He did not leave contact information with anyone

9

at the Boards, and apparently made no efforts to contact anyone at the Boards until February 11.

On February 4, 2004, Oliver and Langevine each had a telephone conversation with Brown's mother, during which she said that Brown was "missing," and had been reported to the police as such.

Langevine subsequently called Dr. Braun's office and left a message requesting that Dr. Braun call Brown's mother. Langevine did not speak with Dr. Braun directly. Dr. Braun stated that nobody at Boards ever attempted to contact him to gain medical information and that, had they done so, HIPPA would have barred him from discussing Brown's medical condition.

On February 5, 2004, Brown's mother learned that Brown was in Costa Rica. She was in contact with him on several occasions over the course of the next several days, but did not contact the Boards.

Brown did not on Monday, February 9, 2004 appear for work, nor did he contact Boards that day. Langevine made several attempts to contact Brown on February 9 and 10, all of which were unsuccessful. On February 9, Langevine attempted to call Brown's

10

mother on three occasions but failed to reach her. On February 10, Langevine called Brown's sister just before 7 a.m. Brown's sister indicated that Brown was "sick" and that any further information would have to come from her mother. Brown's sister did not indicate that Plaintiff needed additional time away from work.

Langevine eventually reached Brown's mother shortly before 3 p.m. on February 10. Brown's mother indicated that she had been in touch with Brown daily, and that he was in Costa Rica "running from himself," was "not well" and had "had a breakdown condition." She did not give Langevine contact information for Brown, but stated that she would have Brown contact Langevine.

Brown did not contact anyone at Boards by the end of the work day on February 10, 2004, despite his apparent daily access to the telephone.

Late in the afternoon of February 10, Langevine, Oliver and Downs held a meeting (Downs attended by telephone) to discuss Brown's continued employment and decided to terminate him for failing to appear or call in accordance with the employee manual. The Boards asserts that the basis for the termination was that Brown was no longer a missing person, had failed to contact the Boards despite his ability to do so, and that the company had no

11

facts, such as a doctor's statement, indicating any medical reason for his absence. Boards insists that there was no discussion of Brown's health during this meeting and that had there been timely medical documentation that Brown was absent on February 9 and 10 for medical reasons, he would not have been terminated that day.

Brown was terminated at approximately 5:30 p.m. on the afternoon of February 10, 2004. He was informed by letter, which was given to the mailroom at the Boards at the time of his termination. The letter stated that the termination was for job abandonment and cited the employee manual. Before Brown, no other employee at the Boards had abandoned his job by failing to call or report to work for two straight days. Another Boards employee, Tom Carney, had previously been terminated for excessive tardiness and failure to provide a doctor's note, but he called in on any days for which he would miss the entire day.

On February 11, 2004, the day after the decision to terminate Brown had been made and implemented, Brown contacted Langevine from Costa Rica by telephone. Brown stated that he had had a nervous breakdown, described some of his symptoms to Langevine, and told her to expect a doctor's note. According to Brown, Langevine asked why had had gone to Costa Rica, and he replied that he was seeking help from his family.

12

Langevine did not mention Brown's HIV status during this conversation. Langevine received a note later that day that purported to be a medical note, but which Boards claims was illegible.

On March 1, 2004, Dr. Braun examined Brown for the first time since January 29, 2004. Based on this examination, Dr. Braun believed Brown would have been unable to work on February 9 and February 10, and that he remained incapable of working. Consequently, Dr. Braun wrote another note excusing Brown from work. The note was faxed to Langevine on March 1st and indicated that Brown was under Dr. Braun's care "for chronic illness recently complicated by a nervous condition requiring psychiatric care" and that Brown was "unable to work until he becomes stable on appropriate medication." Dr. Braun noted that he could not predict when Brown would be able to return to work.

On March 17, 2004, Brown saw Dr. Deeptha Nedunchezian, a board certified Infectious Disease specialist. Dr. Nedunchezian detected in Brown signs of depression, anxiety, suicidal thoughts, and paranoid thinking. Over the course of the next few visits, Dr. Nedunchezian confirmed these symptoms. It was Dr. Nedunchezian's opinion that Brown was unable to work at that time. At least through August 2004, Dr. Nedunchezian was of the opinion that Brown

13

remained unable to work.

Dr. Braun referred Brown to a radiologist, Dr. Sunil Trasi, who determined that Brown did not have any opportunistic infection, such as pneumo-cystic pneumonia, related to HIV. Dr. Braun also referred Brown to a psychotherapist for a support group or private counseling. Brown has alleged treatment from several doctors and facilities in Costa Rica. Brown took Risperdal, an anti-psychotic, in February 2004, and Kaletra and Combivir, antiretroviral medications, starting on April 2, 2004.

Brown was also treated by a psychiatrist, Dr. Paul A. Corley, from March 4, 2004 to May 27, 2004. Dr. Corley diagnosed Brown with: anxiety disorder NOS, R/O brief psychiatric disorder, deferred 799.7, HIV infection, and severe occupational problem.

Dr. Corley, in mid-April 2004, recommended that Brown not return to work until May 3, 2004. This was the first time any health care professional had determined a date on which Brown would be expected to be able to return to work. Dr. Corley wrote a note on May 12 indicating that Brown could only work four hours per day until June 10, 2004.

Brown has submitted no direct evidence that anyone at the

14

Boards knew he was HIV positive.  A Boards employee, Shannon Karr ("Karr"), once assisted him in November or December 2003 with obtaining payment for a medical bill from the Boards' third party administrator.  Karr maintains that she did not audit or review the bills, but instead simply sent them to the claims processing unit to be handled.

The medical bill in question, from January 2003, was for diagnostic laboratory testing and contained certain personal information, the type of laboratory tests done, and a code representing the diagnosis of the patient.  Code "42," which was on the testing order, is the code for HIV status, according to Brown.  There was a book at Boards identifying the codes.  Brown has presented no evidence that Karr passed any information regarding his diagnosis code to anyone at Boards.

Karr testified that she did not know the nature of the testing and had no knowledge about the state of Brown's health, other than that he must have had some medical services performed.  She further testified that she had no familiarity with the codes for blood tests pertaining to HIV or AIDS and never shared with Boards any information regarding Plaintiff's health.

15

## Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the

16

motion." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir.
1987); see also Eastway Constr. Corp. v. New York, 762 F.2d 243,
249 (2d Cir. 1985). However, the court must inquire whether "there
is sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986). If there is not, summary judgment is
proper. See id. at 249-50.

## Brown Has Not Established Disability Discrimination

When the plaintiff asserts that the employer's decision
was a pretext for discrimination, courts use the well known
McDonnell Douglas burden-shifting framework. See McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 793 (1973). First, the plaintiff
must prove by a preponderance of the evidence a prima facie case of
discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.
248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802-04; Terry v.
Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Weinstock, 224 F.3d at
42.    Only if the plaintiff meets this initial burden will the
burden then shift to the defendant to produce evidence that the
adverse   employment   action   was   taken   for   some   legitimate,
non-discriminatory reason.    See Burdine, 450 U.S. at 254-55.    If
the defendant articulates a legitimate non-discriminatory reason
for its action, "the presumption raised by the prima facie case is

17

rebutted, and drops from the case." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 255 n.10). Then, the plaintiff has the ultimate burden to demonstrate by a preponderance of the evidence that the articulated reason offered by the defendant for the adverse employment action is merely a pretext for actual discrimination. Mandell v. County of Suffolk, 316 F.3d 368, 380-81 (2d Cir. 2003).

The question for the court on summary judgment is whether the plaintiff's evidence, taken as a whole, establishes a substantial likelihood that the employer intentionally discriminated against the plaintiff. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000); see also Moorehead v. New York City Transit Auth., 385 F. Supp. 2d 248, 253-54 (S.D.N.Y. 2005) (assuming a prima facie case and proceeding directly to the "ultimate issue"); Jalal v. Columbia Univ., 4 F. Supp. 2d 224, 234 (S.D.N.Y. 1998) (declining to "dance mechanistically through the McDonnell Douglas and Price Waterhouse 'minuets'" and proceeding directly to the ultimate issue).

Additionally, it is within the court's discretion to resolve pendent state claims on summary judgment, particularly where the court determines that by doing so, the interests of judicial economy are served because the plaintiff's claims under

18

state and city law are analyzed under the same standards as the federal claims. See, e.g., Barriera v. Bankers Trust, 2003 WL 22387099, at *9 (S.D.N.Y. Oct. 20, 2003) (exercising supplemental jurisdiction, dismissing state and city claims along with Title VII claims on summary judgment for reasons of judicial economy given identical analysis).

To state a prima facie case of disability discrimination under the ADA, NYSHRL, or NYCHRL, a plaintiff must show: (1) the employer is subject to the ADA, NYSHRL, or NYCHRL; (2) he suffers from a disability within the meaning of the ADA, NYSHRL, or NYCHRL; (3) he is otherwise qualified to perform his job; and (4) he suffered an adverse employment decision because of his disability. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003); Reeves v. Johnson Controls World Servs., 140 F.3d 144, 156 n.9 (2d Cir. 1998); Sista v. CDC Ixis N. Am., Inc., 2005 U.S. Dist. LEXIS 2163, *20 n.7 (S.D.N.Y. Feb. 15, 2005).

For the purposes of this motion, Boards concedes that Brown has established the first two requirements: Boards was subject to all three laws and either Brown's HIV status or mental health condition (or both) constituted a disability under each of the laws. Additionally, it is uncontested that Brown suffered an adverse employment decision when Boards terminated his employment

19

on February 10, 2004. However, there is no evidence to support Brown's allegation that his termination was due to his disability.

The only support for Brown's contention that his termination was due to his HIV status is that a Boards employee, Karr, once assisted him in filing a claim for medical tests which were apparently related to his HIV infection. All testimony and evidence, however, indicate that Karr -- and indeed, all other Boards employees -- were unaware of Brown's HIV status and that it accordingly played no role in Boards' decision to terminate his employment. "At a minimum, for there to be causation, the employer must have knowledge of the disability." Barnett v. Revere Smelting & Ref. Corp., 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999).

Similarly, Brown has not presented adequate evidence that Boards was aware he had a mental condition that was a disability. The only contact made to Boards prior to its termination decision was Dr. Braun's January 29, 2004 note, which made no mention of a mental condition, and the two brief telephone conversations Langevine had with Plaintiff's sister and mother. Brown's mother's comment that Plaintiff was in a "breakdown condition," without any reference to hospitalization or any medical attention he was receiving, did not put Boards on notice that Brown had a diagnosed mental condition constituting a disability.

20

Even if Brown had established a prima facie case, he has failed to demonstrate that Boards' professed reason for the termination was pretextual. Here, "Plaintiff's actions provided a reasonable basis to terminate his employment . . . . Plaintiff's behavior was simply conduct which an employer could legitimately determine was inappropriate and unacceptable in the workplace." Sista, 2005 U.S. Dist. LEXIS 2163 at *19-*20.

Brown was terminated for violating company policy requiring an employee to call in to work if he or she was going to be absent for any reason. "Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification, even if the absences are attributable to a medical problem." Jackson v. Nor Loch Manor Healthcare Facility, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004), aff'd 134 Fed. Appx. 477 (2d Cir. 2005). The record indicates that Brown was capable of complying with the call-in policy despite his alleged disability, especially in light of the fact that he was in daily telephone contact with his mother while in Costa Rica before his termination.

The record reveals no connection between Brown's alleged disabilities and his termination. The record contains no statement that Brown was terminated due to a disability, no comments were

made to indicate a bias against HIV positive individuals or those suffering mental health impairments. Brown has contended that Boards would have wanted to terminate him because of the costs associated with employing people with disabilities, however, no such cost considerations are contained in the record.

Brown has not established that Boards knew he had a qualifying disability, that the disability was the reason for his discharge or even actions to show a prior bias by Boards against individuals with disabilities. The failure to call in during audit time constituted an abandonment of his obligations as Controller to the company. Moreover, Brown has not demonstrated that this policy was unevenly applied. To the contrary, Brown was the only person who ever failed to call or appear for work for two consecutive days. In short, Brown has failed to establish that a reasonable trier of fact could find that the termination was due to discrimination based on disability status.

## **Brown Has Not Established Failure to Accommodate**

"It is settled that an employee cannot hold an employer liable for failing to provide an accommodation that the employee has not requested in the first place." Falchenberg v. New York City Dep't of Educ., 375 F. Supp. 2d 344, 348 (S.D.N.Y. 2005)

22

(citation omitted). Here, Brown never accomplished this essential element, because he failed to put Boards on notice that he desired an accommodation prior to his termination. To the extent that Dr. Braun's letter of January 29, 2004 to Boards noting that Brown would be unable to work until February 9 constituted an accommodation request, Boards granted the request.

Any notice on or after Brown's termination on February 10, 2004 is ineffective. See Scott v. Mem'l Sloan-Kettering Cancer Ctr., 190 F. Supp. 2d 590, 596 (S.D.N.Y. 2002) (holding that "the ADA only applies to employees" and that requests for accommodations must be made prior to termination). Moreover, at the time of his discharge and shortly thereafter, his doctors were uniform in their belief that Brown unable to work, and none could predict when (or if) he would be able to return to work. Indeed, the first note written after his termination, on March 1, 2004, by Dr. Braun, left his prognosis for return completely open-ended (indicating Brown was "unable to work until he becomes stable on appropriate medication"). The first note to Boards which indicated a tentative return date was faxed to Langevine in mid-April 2004, more than two months after Plaintiff failed to return to work on February 9, 2004. Boards had been given no prior indication when, or if, Brown would be able to return to work.

23

After Brown's termination, he requested an open-ended, indefinite leave of absence with no guarantee that it would actually enable him to eventually return to work to perform his essential job functions. Such a request goes beyond the requirements of the ADA. See Stamey v. NYP Holdings, Inc., 358 F. Supp. 2d 317, 324 (S.D.N.Y. 2005) ("The ADA does no[t] require an employer to grant an employee an indefinite leave of absence. . . . [Plaintiff's doctors'] letters highlight the fact that plaintiff's doctors could not assess when plaintiff could return to work.") (citing Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 9 (2d Cir. 1999)).

## Interference With the Family and Medical Leave Act Has Not Been Established

Under the FMLA, eligible employees are entitled to twelve weeks per year of unpaid leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006). At the conclusion of an employee's FMLA leave, he is entitled to return to the same position or its equivalent. See Sista, 445 F.3d at 174. "The FMLA creates a private right of action to seek both equitable relief and money damages against any employer . . . . should that employer interfere with, restrain, or deny the exercise

24

of FMLA rights." Id. (citing Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003)) (internal quotations marks omitted). Brown has claimed that Boards both interfered with his FMLA rights and retaliated against him for exercising those rights.

To state a prima facie claim for interference with FMLA rights, Brown must demonstrate that: 1) he was an eligible employee under the FMLA; 2) Boards is an employer under the FMLA; 3) Brown was entitled to leave under the FMLA; 4) Brown gave notice to Boards of his intention to take leave; and 5) Brown was denied benefits to which he was entitled under the FMLA. Garraway v. Solomon R. Guggenheim Found., 415 F. Supp. 2d 377, 382 (S.D.N.Y. 2006). Boards asserts that Brown has failed to adequately establish the fourth and fifth elements of his interference claim (i.e., notice and denial of benefits).

Under the FMLA, employees are required to provide, whenever possible, at least thirty days' notice for leave that is foreseeable. See 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302(a); Slaughter v. Am. Bldg. Maint. Co., 64 F. Supp. 2d 319, 325 (S.D.N.Y. 1999).

However, where the need for leave has arisen unexpectedly, the regulations provide that:

25

(a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

29 C.F.R. § 825.303.

An employee seeking leave need not expressly invoke the FMLA in her notification; it is sufficient that she give a basis for her leave that qualifies under the FMLA. See Slaughter, 64 F. Supp. 2d at 325. After the employee provides the required notice, "the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying." Id.

26

Brown contends that his phone calls to Boards on January 27-30, Dr. Braun's letter of January 29, Langevine's brief conversations with Brown's sister and mother, and an additional physician's letter received by Boards on February 11 (which Boards claims was illegible) taken collectively constituted adequate notice under the FMLA.

Viewing the facts in the light most favorable to Brown, the above contacts fail to constitute adequate notice to Boards that Brown had an FMLA-qualifying condition.

Merely calling in sick, as Brown did on January 27-30, is insufficient to put a company on notice that an employee is requesting leave that may be eligible under the FMLA. See Slaughter, 64 F. Supp. 2d at 326 (collecting cases). There is no evidence in the record that Brown provided any information in his calls that his absence was due to a condition that could be eligible for FMLA coverage.

Dr. Braun's letter was similarly vague, in that it stated that Brown was suffering from "an exacerbation of chronic illness" and in any event stated that Brown would be able to return to work on February 9. Brown argues that Langevine's brief conversations with his sister and mother constituted FMLA notice for the period

27

starting with February 9, in light of the fact that Boards was already appraised of Brown's "chronic illness."   However, an "employer is not required to be clairvoyant."   Johnson v. Primerica, 1996 U.S. Dist. LEXIS 869, *16 (S.D.N.Y. 1996).  Here, there was no way -- other than temporal proximity -- for the Boards to connect Brown's undefined chronic illness with Brown's relatives' statements that he was "sick" and in "a breakdown condition."[3]  Cf. Barnett, 67 F. Supp. 2d at 386 (refusing to find notice insufficient where employee called in sick and employer had prior knowledge of plaintiff's serious medical condition and/or symptoms).

Furthermore, under the applicable regulations, a spokesperson for the employee may give notice on her behalf "only if the employee is unable to do so personally."   29 C.F.R. § 825.303 (b).  Here, despite being in daily phone contact with his mother, Brown did not contact Boards until February 11, after his termination for failure to abide by Boards' call-in policy.  There is nothing in the record to suggest that Brown was unable to contact Boards himself; indeed, the record indicates that Brown was in fact able to do so.  Thus, the statements of Brown's mother and

---

[3] It should also be noted that the record indicates that the "chronic medical condition" to which Dr. Braun's note referred (i.e., HIV), was at best only indirectly related to the actual reason for Brown's absence, his alleged mental breakdown.

28

sister do not constitute adequate notice under the FMLA. See Slaughter, 64 F. Supp. 2d at 329 ("while Slaughter claims that his back troubles made him unable to work, nothing in the record indicates that he was unable to contact [his employer]"); Pesok v. Hebrew Union College-Jewish Inst. of Religion, 235 F. Supp. 2d 281, 290 (S.D.N.Y. 2002).

Finally, the additional medical letter of February 11 did not constitute adequate notice. In addition to being from a spokesman and thus subject to the same objections as the "notice" from Brown's relatives, the letter was received after Brown's termination for violation of Boards' call-in policy. See Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004); Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877-78 (10th Cir. 2004).

Brown has also failed to show that Boards' actions amounted to a denial of FMLA benefits. Even had Boards granted Brown twelve weeks of unpaid leave pursuant to the FMLA beginning on his first day of absence (January 27), the only evidence in the record indicates that he would have been unable to commence work upon the expiration of the FMLA leave. Brown's leave would have expired Tuesday, April 20, 2004, and he would have had to return to work that day to be entitled to reinstatement. See Geromanos, 322 F. Supp. 2d at 428. However, it is uncontested that Brown was not

29

yet capable of returning to work on that date. According to the notice provided by Dr. Corley to Boards, the earliest Brown could return to work was May 3, 2004. Accordingly, even assuming that Brown met all requirements to be eligible for the FMLA, he has failed to demonstrate any denial of FMLA benefits, a necessary element of an interference claim.

## Retaliation Has Not Been Established

Claims of retaliation under the FMLA are evaluated using the McDonnell Douglas burden-shifting standard. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). To state a prima facie case for retaliation, the plaintiff must show: (1) she exercised rights protected under the FMLA; (2) she was otherwise qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. Id. As with ADA discrimination claims, if the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse action. See Esser v. Rainbow Adver. Sales Corp., 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006). If defendant is successful, the plaintiff bears the burden of showing that defendant's proffered rationale is pretextual. See id.

30

As set forth above, Brown failed to provide Boards with adequate notice under the FMLA. Consequently, Brown did not enjoy FMLA protection and could not avail himself of the rights that flow from the FMLA, a necessary element of a retaliation claim. See Potenza, 365 F.3d at 168.

Brown additionally fails to raise an inference of retaliatory intent in Boards' decision to end his employment. Termination for violation of a company call-in policy is a legitimate, non-discriminatory and non-retaliatory reason for discharge. See Jackson, 297 F. Supp. 2d at 636. There is nothing in the record to demonstrate Boards' decision was retaliation for Brown's exercise of FMLA rights. Mere "[t]emporal proximity, standing alone, is insufficient to carry plaintiff's burden at [the pretext analysis]." Pelligrino v. County of Orange, 313 F.Supp.2d 303, 316 (S.D.N.Y. 2004); Bombero v. Warner-Lambert Co., 142 F. Supp. 2d 196, 211 (D. Conn. 2000). Because Brown has provided no other evidence of retaliation, his claim must fail.

## Conclusion

For all the foregoing reasons, Boards' motion for summary judgment is granted and Brown's partial motion for summary judgment is denied.

31

It is so ordered.

**New York, NY**
**May** 21 **, 2007**

ROBERT W. SWEET
U.S.D.J.

32